## Case No. 1,670.

### The BOSTON.

### [1 Gall. 239.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1812.

NONINTERCOURSE ACT—WHAT CONSTITUTES IMPORTATION.

1. If British goods are put on board a vessel, with intent to import them into the United States, they are forfeited under the act of 1st March, 1809, c. 91 [2 Story's Laws, 1115; 2 Stat. 529, c. 24], whether the owner intended thereby to violate the act or not.

[Cited in The Coquitlam, 57 Fed. 717.]

2. If a vessel voluntarily arrive at her port of destination with a cargo, it constitutes in point of law an importation. See 1 Gall. 206 [The Mary, Case No. 9,183.]

[Distinguished in Waring v. Mayor, etc., 8 Wall. (75 U. S.) 120. Cited in U. S. v. Merriam, Case No. 15,759; The Coquitlam, 57 Fed. 717.]

3. The mere coming into port without breaking bulk, is prima facie evidence of an importation.

4. The act of 22d February, 1805, c. 78 [2 Story's Laws, 962; 2 Stat. 315, c. 18], does not vary the general law, as to what constitutes an importation.

[Appeal from the district court of the United States for the district of Massachusetts.]

In admiralty. The information against the schooner Boston and appurtenances alleged, that certain prohibited goods of foreign growth, &c., were, at the Cape of Good Hope, with the knowledge of the owner and master, put on board the same schooner with intention to import the same into the United States, contrary to the act 1st March, 1809, c. 91 [2 Story's Laws, 1115; 2 Stat. 529, c. 24], and that the same goods were afterwards, in pursuance of the same intention, actually imported into the port of Boston. The information against the cargo contained substantially the same allegations, the former being founded on the 6th section, the latter on the 5th section, of the act. There were special claims in the case, which in general admitted the facts, but denied any intention to violate the laws. It was admitted that the facts were truly stated in the decree of the district court [unreported]. From that decree and the accompanying papers, it appeared, that John D. Williams & Co., the principal claimants and owners of the schooner, in October, 1810, transmitted orders to their agent at the Cape of Good Hope, to purchase 168 casks of wine, constituting the bulk of the cargo. That after the president's proclamation of the 2d of November, 1810, was well known, to wit, on the 10th of December, 1810, the schooner sailed from Boston for the Cape of Good Hope. That the cargo was taken on board at the Cape on the 20th of April, 1811, with an alleged destination, as the clearance expressed, "for Boston." That the schooner with her cargo on board, sailed from the Cape for Boston, and voluntarily and without any necessity arrived at Boston, on Sunday the 24th June, 1811. That on the next morning, as soon as the custom-house was opened, a manifest was presented by the claimants, alleging that the schooner was "bound for Boston and St. Bartholomews," and the claimants asked leave to depart for St. Bartholomews, on giving bonds pursuant to the act 22d February, 1805, c. 78 [2 Story's Laws, 962; 2 Stat. 315, c. 18], which permission the collector refused, and immediately seized the vessel as forfeited. There did not appear to have been any concealment of the facts on the part of the claimants, and they rested their defence upon the strong presumptions arising from their open and fair conduct.

G. Blake, for the United States.

C. Jackson, for claimants.

STORY, Circuit Justice. It has been contended by the counsel for the claimants, the schooner and cargo are not forfeited, because the cargo was not taken on board with an intention to import the same into the United States, contrary to the act of 1st March, 1809; that their whole conduct shows that they never meant to violate the law, but intended the importation should be made into the United States, upon the contingency only that it should by subsequent events become lawful; and that within forty-eight hours after the arrival of the schooner at Boston, they gave an ulterior destination to the property, which was perfectly lawful. There is no evidence in the case, to show that a contingent destination for Boston, was in the original contemplation of the parties. The master voluntarily took on board his cargo for that port, and (for aught that appears in the case) came into port, with the intention to make it his port of discharge. The destination for St. Bartholomews appears to have been an after thought, and in the absence of all contrary evidence, I must take that to have been the real fact.

I cannot admit, that to constitute a forfeiture within the act, it is necessary that the party should have intended a clandestine importation or a fraudulent smuggling traffic. The 4th section of the act declares, that it shall not "be lawful to import into the United States, or the territories thereof, any goods, wares, or merchandise whatever, from any port or place situated in Great Britain or Ireland, or in any of the colonies or dependencies of Great Britain," &c. "nor shall it be lawful to import into the United States, or the territories thereof, from any foreign port or place whatever, any goods, wares, or merchandise, being of the growth, produce, or manufacture, &c. of Great Britain or Ireland, or of any of the colonies or dependencies of Great Britain," &c. "or of any

[1] [Reported by John Gallison, Esq.]

place or country in the actual possession of Great Britain." The 5th section then declares, that whenever any article or articles, the importation of which is prohibited by this act, shall be imported into the United States, or the territories thereof, contrary to the true intent and meaning of this act, or shall be put on board of any ship, &c. with intention of importing the same into the United States, or the territories thereof, they shall be forfeited; and the 6th section provides, that if such articles are with such intention put on board, with the knowledge of the owner or master of the ship, such ship also shall be forfeited. By the operation of these sections then, not only the actual importation of prohibited goods into the United States, but the lading of them with an intention of importation into the United States, is made an offence. It is true, that the actual or intended importation must be "contrary to the true intent and meaning of the act;" but this means, not that the party should actually intend at all events to violate the law by fraudulent or collusive conduct, but that the actual or intended importation should be from such ports, and of such goods, as are prohibited by the 4th section of the act. The offence does not depend upon the intention of the party to violate the law, but upon his intention to import the prohibited articles. Where the law prohibits certain acts, it is immaterial whether the party supposes them to be an offence or not. In the language of Sir Wm. Scott (1 C. Rob. Adm. 218), "the intention of the parties might be perfectly innocent, but there is still the fact against them of the actual contravention of the law, which no innocence can do away." Admitting, therefore, for the sake of the argument, that the parties did not mean to violate the law by palpable frauds, yet if they did intend to import the cargo into the United States, it was within the prohibition of the law, and the forfeiture attached. But I think it will be somewhat difficult to sustain the admission of innocence in its full extent. At the time of the departure of the schooner, the president's proclamation was universally known. By that public declaration the act in question was revived, from and after the expiration of three months from the date of the same proclamation, unless Great Britain should within the same three months revoke or modify her edicts, so as that they should cease to violate the neutral commerce of the United States. The revival therefore would be absolute on the 2d March, 1811, unless in the interim the offensive orders were revoked. Now it is undoubtedly true, that a merchant had a right to speculate upon the probability of such an event, and certainly it was no crime for him to entertain hopes of such revocation. But the speculation was at his peril, and although he could not, in the East Indies, know whether the act absolutely took effect or not at the time prescribed, yet he could not but know, that if it did, he would

be within its penal influence. But admitting in its whole extent the argument, that there was but a contingent destination for Boston, still I think, that if the destination be consummated by a voluntary arrival at the port, it has a retroactive effect, and must be considered as settling the final character of the transaction.

This leads me to consider another position, which has been assumed by the counsel for the claimants, viz. that the facts do not amount in point of law to an importation into the United States; and the 32d section of the collection act of 2d March, 1799 [1 Stat. 651], and the act of 22d February, 1805, c. 78 [2 Story's Laws, 962; 2 Stat. 315, c. 18], § 2, have been relied on, to show the understanding of the legislature, as to the meaning of the term "importation." And upon the footing of these acts it is argued, that an importation is not complete, until a vessel has actually arrived in port under such circumstances, as render her liable to the payment of duties. It is true, that the act of the 22d February, 1805, permits a vessel, arriving with a cargo from a foreign port, to depart with the same cargo for any foreign port without payment of duties, provided the destination be disclosed in a manifest presented to the collector of the port within forty-eight hours after her arrival. But this by no means implies that the cargo had not been imported into the United States. On the contrary, the legislature use a language which evinces a contrary understanding, for the transaction is called a re-exportation. Independent of this provision of the statute, there can be no doubt that the cargo would have been liable to the payment of duties; and it is too much, to contend that an exception from the generality of a law disproves a construction, upon which alone the law can have its ordinary operation. The acts laying duties levy them upon goods, wares, and merchandise, "brought into the United States from a foreign port or place." Act Aug. 10, 1790, c. 39 [1 Stat. 180]. And such a bringing in, if voluntary, is considered as an importation within the purview of those acts. See Act Aug. 10, 1790, c. 39; Act May 2, 1792, c. 27 [1 Stat. 259]; Act June 7, 1794, c. 54 [1 Stat. 390]; Act Jan. 29, 1795, c. 82, etc. [1 Story's Laws, 376; 1 Stat. 411, c. 17]. In the present case, the voluntary arrival with the cargo, would also be an importation within the true construction of the same acts. But whatever may be the true construction of the term "importation," as applied to articles paying duties, I can have no doubt, that here was an actual importation within the true intent and meaning of the act of 1st March, 1809. I take it to be a well settled rule, that the mere coming into port, though without breaking bulk, is prima facie evidence of an importation. But the presumption may be rebutted by showing that it was occasioned by unavoidable accident or over-ruling necessity. The Eleanor, Edw.

Adm. 135, 160. This was the ground upon which the court decided the case of The Mary [Case No. 9,183] at this term. That case has been cited as applying to the present. But in my judgment, no cases could be more unlike. In the case of The Mary, there was no intention of coming into any port of the United States, unless further orders were received, and the actual arrival was occasioned by stress of weather, against the will and intentions of the parties. The vessel sought a temporary shelter from the irresistible violence of the elements. It was there held, that, to constitute an importation, the cargo must be brought into port voluntarily, and with an intention that the same should be there landed or disposed of. It must not barely arrive within the port, but must arrive there voluntarily, and, as Lord Hale expresses it (Hale, Cust. Harg. Law Tracts, 213), "the goods ought to be imported by way of merchandize." In the case of The Mary, the court did little more than apply a principle, long since settled in the revenue system of Great Britain (Id.; Reeves, Shipp. 196), and founded on solid reasons. The law could never be so far at variance with humanity, as to compel the sufferers by shipwreck, or maritime accidents, to be oppressed under the sanction of the revenue. But I cannot find any case, in which it has been held, that the coming voluntarily into a port, with an intention to make that the port of discharge, unless a future contingent destination shall, after arrival, be given to the property, has been held not to be an importation. Much less can it be admitted, that a vessel can have a right to come into port with goods on board, which are absolutely prohibited from importation, merely with a view to consult on an ulterior disposition of the goods. The cases of The Eleanor, Edw. Adm. 135, and The Paisley, Edw. Adm. Append. 17, in my judgment, authorize a very different conclusion; and if such pretences were allowed, it would be difficult to reach a single case of fraudulent importation, until the property had been removed beyond the grasp of forfeiture. I have no doubt, therefore, that the ship and cargo, in the present case, are forfeited for a contravention of the law. The cargo was taken on board with the intention to be imported, and was actually imported into the United States. I must at the same time admit, that the facts disclose a case entitled to great indulgence; and if I were permitted to consult my feelings instead of my duty, I should be disposed to release the claimants from every penalty. Situated, however, as I am, I must apply the rigid rule of the law, and leave to others, upon whom a more agreeable duty devolves, to apply the proper mitigation or remission of the forfeiture. I reverse the decree of the district court, and adjudge the schooner and cargo to remain forfeited, and that the United States recover their costs. Condemned.